**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL HARRIS, Individually and as the Administrator of the ESTATE of QUINCY DAY-HARRIS<br>46 Anderson Court<br>Bear, DE 19701 | : | |
| Plaintiff | : | Docket No.: |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA<br>1515 Arch Street<br>Philadelphia, PA 19102 | : | **JURY TRIAL DEMANDED** |
| | : | |
| and | : | |
| | : | |
| PRISON COMMISSIONER BLANCHE CARNEY<br>Philadelphia Department of Prisons<br>7901 State Road<br>Philadelphia, PA  19136 | : | |
| | : | |
| and | : | |
| | : | |
| WARDEN MICHELE FARRELL<br>Curran-Fromhold Correctional Facility<br>7901 State Road<br>Philadelphia, PA 19136 | : | |
| | : | |
| and | : | |
| | : | |
| SERGEANT JEFFREY BISHOP<br>Curran-Fromhold Correctional Facility<br>7901 State Road<br>Philadelphia, PA 19136 | : | |
| | : | |
| and | : | |
| | : | |
| CORRECTIONAL OFFICER JORDAN HARRIS<br>Curran-Fromhold Correctional Facility<br>7901 State Road<br>Philadelphia, PA 19136 | : | |
| | : | |

and                                             :
                                                :
CORRECTIONAL OFFICER ANDREW                     :
MENDES                                          :
Curran-Fromhold Correctional Facility           :
7901 State Road                                 :
Philadelphia, PA 19136                          :
                                                :
and                                             :
                                                :
CORRECTIONAL OFFICERS                           :
JOHN/JANE DOES (1-10) (Fictitious)              :
Curran-Fromhold Correctional Facility           :
7901 State Road                                 :
Philadelphia, PA 19136                          :
                                                :
and                                             :
                                                :
CENTURION HEALTH                                :
21251 Ridgetop Circle                           :
Sterling, VA 20166                              :
                                                :
and                                             :
                                                :
MHM SERVICES, INC.                              :
1593 Spring Hill Rd., Suite 600                 :
Vienna, VA 22182                                :
                                                :
and                                             :
                                                :
AMY FISHER, LSW                                 :
Centurion Health                                :
21251 Ridgetop Circle                           :
Sterling, VA 20166                              :
                                                :
                                                :
and                                             :
                                                :
KYERSTYN O'HARA, SW                             :
Centurion Health                                :
21251 Ridgetop Circle                           :
Sterling, VA 20166                              :
                                                :
and                                             :
                                                :
                                                :

2

| | |
|---|---|
| JILL REGALBUTO, LSW | : |
| a/k/a Jill Harris | : |
| Centurion Health | : |
| 21251 Ridgetop Circle | : |
| Sterling, VA 20166 | : |
| | : |
| and | : |
| | : |
| MEDICAL PROVIDERS JOHN/JANE | : |
| DOES (1-10) (fictitious) | : |
| Centurion Health | : |
| 21251 Ridgetop Circle | : |
| Sterling, VA 20166 | : |
| | : |
| Defendants | : |

## COMPLAINT

## THE PARTIES

1.      Plaintiff, Michael Harris, is an adult individual residing at 46 Anderson Court, Bear, DE  19701.

2.      On July 13, 2023, Plaintiff was granted Letters of Administration by the Register of Wills Office of Philadelphia City, Pennsylvania to act as the Administrator of the Estate of Quincy Day-Harris, his deceased son ("Day-Harris").

3.      Day-Harris was born on January 1, 1996 and died on August 25, 2021, after hanging himself on August 21, 2021 while being detained at Curran Fromhold Correctional Facility ("CFCF"), a City prison located at 7901 State Road in Philadelphia, Pennsylvania.  At age 25, he was survived by Plaintiff (his father residing at the above-captioned address) and his mother Juanita Day (residing at 1900 Allegheny Avenue, Apt. 418, Philadelphia, Pennsylvania 19132).

4.      Defendant City of Philadelphia ("the City") is a municipality of the Commonwealth of Pennsylvania with a principal place of business located at 1515 Arch Street,

Philadelphia, Pennsylvania 19102.  At all relevant times, the City owned and operated CFCF, one of four correctional facilities operated by the Philadelphia Department of Prisons ("PDP"), and employed the Officer Defendants identified below.

5.      Defendant Blanche Carney ("Commissioner Carney") was, at all relevant times, the Commissioner of the PDP, acting under the color of law and within the course and scope of her employment with the City, and serving as the highest-ranking supervisor and policymaker for the PDP, including CFCF.

6.      Defendant Warden Michele Farrell ("Warden Farrell")  was, at all relevant times, the Warden at CFCF, acting under the color of law and within the course and scope of her employment with the City, responsible for the safety and security of CFCF prisoners and the staffing and supervising of CFCF personnel.

7.      Defendant Sergeant Jeffrey Bishop ("Sgt. Bishop") was, at all relevant times, a Sergeant at CFCF, acting under the color of law and within the course and scope of his employment with the City.

8.      Defendant Correctional Officer Jordan Harris ("CO Harris") was, at all relevant times, a Correctional Officer at CFCF, acting under the color of law and within the course and scope of his employment with the City.

9.      Defendant Correctional Officer Andrew ("CO Mendes") was, at all relevant times, a Correctional Officer at CFCF, acting under the color of law and within the course and scope of his employment with the City.

10.      Defendant Correctional Officers John/Jane Does (1-10) were correctional officers or supervisors employed by the City to work at CFCF.  Plaintiff does not presently know the names of these defendants after conducting a reasonable search, including a review of pre-

complaint discovery produced by the City.  Plaintiff expects to learn the names of these additional correctional officers and/or supervisors through formal discovery and will promptly take steps to substitute actual names for these fictious names.[1]

11.     Defendant Centurion Health ("Centurion") is a national provider of behavioral health and other healthcare services with a principal place of business at the above-captioned address which, at all relevant times, was under contract with the City to provide psychiatric and mental health services to CFCF prisoners such as Day-Harris.  Upon information and belief, at all relevant times, Centurion employed the Medical Defendants identified below and operated in Pennsylvania under the business name Centurion Detention Health Services, LLC.

12.     Defendant MHM Services, Inc. ("MHM") is a national provider of behavioral health and other healthcare services with a principal place of business at the above-captioned address which, at all relevant times, was under contract with the City to provide psychiatric and mental health services to CFCF prisoners such as Day-Harris.  Upon information and belief, at all relevant times, MHM was a subsidiary of Centurion and operated in Pennsylvania under the business name MHM Correctional Services, LLC.  Centurion and MHM are hereinafter collectively referred to as "Centurion".

13.     Defendant Amy Fisher, LSW ("Social Worker Fisher") was, at all relevant times, a social worker who was working at CFCF, acting under the color of law and within the course and scope of her employment and/or agency with Centurion.

14.     Defendant Kyerstyn O'Hara, SW ("Social Worker O'Hara") was, at all relevant times, a social worker who was working at CFCF, acting under the color of law and within the course and scope of her employment and/or agency with Centurion.

---

[1] The City, Commissioner Carney, Warden Farrell, Sgt. Bishiop, CO Jones, CO Mendes, and Correctional Officers John/Jane Does (1-10) are hereinafter collectively referred to as the "Officer Defendants".

15.     Defendant Jill Regalbuto, LSW, a/k/a Jill Harris ("Social Worker Regalbuto") was, at all relevant times, a social worker who was working at CFCF, acting under the color of law and within the course and scope of her employment and/or agency with Centurion.

16.     Defendant Medical Providers John/Jane Does (1-10) were doctors, nurses, or other medical providers working at CFCF as employees and/or agents of Centurion.  Plaintiff does not presently know the names of these defendants after conducting a reasonable search, including a review of pre-complaint discovery produced by Centurion.  Plaintiff expects to learn the names of these additional medical providers through formal discovery and will promptly take steps to substitute actual names for these fictious names.[2]

17.     At all relevant times, the City and Centurion were acting, or alternatively failed to act, by and through their employees, agents, and/or ostensible agents, who were acting within the course and scope of their employment, agency, and/or ostensible agency.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction of this action over all Defendants pursuant to 42 U.S.C. § 1983 as well as 28 U.S.C. § 1331.  This Court has jurisdiction over the pendant state tort law claims pursuant to 28 U.S.C. § 1367(a).

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiff's claims took place here, as did Day-Harris's suicide.

---

[2] Centurion, MHM, and Social Workers Fisher, O'Hara, and Regalbuto, and Medical Providers John/Jane Does (1-10) are hereinafter collectively referred to as the "Medical Defendants".  Plaintiff is asserting, *inter alia*, a professional negligence claims against the Medical Defendants and is filing herewith the appropriate Certificates of Merit in accordance with Pennsylvania Rule of Civil Procedure 1042.3 (collectively attaching the Certificates as Exhibit A hereto).

## FACTUAL BACKGROUND

20.     Long before he hung himself on August 21, 2021, Day-Harris's mental health issues and troubled history were well known to both the City and Centurion.

21.     According to prison records, Day-Harris was previously detained at CFCF on six occasions going back to 2016.

22.     During his initial detainment in 2016, Day-Harris reported to MHM that he had recently attempted suicide in police custody ("tied a sheet around his neck"), that he had also attempted suicide by cutting as a juvenile, and that he "wanted to kill himself."  He was placed on suicide watch.

23.     During a 2017 detainment, he again told MHM about attempting suicide the prior year, and also reported a history of mental health treatment and prescriptions for psychotropic medications.

24.     During a 2018 detainment, Day-Harris was diagnosed with schizophrenia, opioid use disorder, and major depressive disorder and was placed on suicide watch.

25.     Earlier that same year, he was admitted to the Fairmount Behavioral Health Hospital for schizoaffective disorder. He was involuntarily readmitted to the same hospital in June of 2019 following an intentional overdose suicide attempt, for which he was also treated at Pennsylvania Hospital.  Those records noted prior suicide attempts and a medical history of schizophrenia, bipolarism, anxiety, and depression.

26.     During a 2019 detainment, Day-Harris reported being bipolar, schizophrenic, and paranoid, and was again placed on suicide watch.  He was seen banging his head against the door and threatened to kill himself.

27.     In 2020, Day-Harris was admitted by court order to Norristown State Hospital, where he received psychiatric treatment for seven months and reported "at least" five previous psychiatric hospitalizations including but not limited to the aforementioned Fairmount Hospital.

28.     During a 2020 detainment, following his discharge from Norristown Hospital, he reported 4-5 previous suicide attempts and was administered Zyprexa.

29.     On February 25, 2021, Plaintiff was forced to have his son admitted on a 302 petition to Pennsylvania Hospital, due to bizarre behavior and paranoia consistent with psychosis and catatonia.  Day-Harris reported auditory hallucinations and was administered Ativan during a three week hospitalization.

30.     On May 3, 2021, he was again involuntarily committed, this time back to Fairmount Hospital for over two weeks, for bizarre behavior including a refusal to eat or medicate and reporting "voices telling him to kill himself."  Discharge medications included Ativan and Abilify.

31.     On August 1, 2021, Day-Harris was arrested by City police and taken to Albert Einstein Hospital for wrist pain, where he proceeded to assault a police officer, as captured on video.

32.     On subsequent video taken by City police that evening and the next day, Day-Harris is seen acting disturbed, confused, agitated, and combative on numerous occasions while in City police custody.

33.     Day-Harris was admitted to CFCF on August 2, 2021, where the intake doctor noted a history of serious mental illness and a preliminary positive HIV test, and made an urgent behavioral health referral.  A medication history report showed that Day-Harris filled prescriptions for Lorazepam and Olanzapine on March 17, 2021.  Also upon intake, Day-Harris

signed a form authorizing the PDP to obtain all of his medical information, including inpatient and outpatient psychiatric treatment records.

34.     On August 3, 2021, Social Worker O'Hara assessed Day-Harris, erroneously noting that he had no recent psychiatric hospitalizations since his last incarceration, that he reported no history of mental health treatment, and had no recent suicidal ideation or assaultive behavior (though he had homicidal thoughts toward the arresting police).

35.     Although Social Worker O'Hara referred Day-Harris for an urgent IPE due to some inconsistencies in Day-Harris's report as compared to his chart, she failed to accurately report his mental health history and assessed him as a "low" risk.  The IPE was scheduled for August 5th.

36.     On August 4, 2021, Social Worker Regalbuto requested and received a list of "SMI Patients" [Serious Mental Illness] at CFCF, on which Day-Harris was listed.

37.     On August 5th, Day-Harris's IPE inexplicably did not occur as scheduled.

38.     On Augst 6th, Cassandra Rozsas, Centurion's Continuous Quality Improvement Coordinator, circulated a report to numerous Centurion personnel, including Social Worker Regalbuto, "showing inconsistencies between patients' caseload status and SMI flag" (e.g. patient had SMI diagnosis but was not on the Behavioral Health case list).  The purpose of the report was to "identify patients who should be added to the caseload."  Day-Harris again appeared on the list.

39.     According to Patient Housing Visit Notes for Day-Harris, on both August 9th and August 10th, medical visits were thwarted due to there being "not enough staff".

40.     On August 11th, Ms. Rozsas circulated another report which reflected "patients' caseload status, SMI flag, and med status."  Upon information and belief, Day-Harris, appeared on this report too.  That same day, Day-Harris apparently refused "labs and clinic."

41.     On August 18th, Day-Harris refused COVID testing for court and was transferred to isolation.  He was seen for segregation clearance due to being pepper sprayed and was referred for an emergency behavioral health appointment.

42.     Later that day, Social Worker Fisher assessed Day-Harris, finding him withdrawn and slow to respond, with poor eye contact.  Day-Harris was unwilling to answer historical risk factor questions, such as prior suicidal behavior and ideation, but apparently denied any current suicidal ideation.  Social Worker Fisher simply noted that his IPE was "pending", assessed him as "low" risk, and cleared him for segregation.  On a segregation placement form, which somehow reflected that Day-Harris was <u>not</u> listed as SMI, Social Worker Fisher indicated that there was no behavioral health contraindication to segregation placement.

43.     On August 19th, Day-Harris complained of burning eyes to a nurse, who found him to be disoriented, withdrawn, slow to respond, and virtually inaudible.  According to the records, "CO Harris was able to get inmate to communicate that he had been peppersprayed while at CF."

44.     Per the records, although Day-Harris was referred for routine behavioral health, the referral was cancelled on August 19th due to his "pending IPE appointment," and he was instead referred for "discharge planning".  According to a Centurion "Pending Appts Report – 9/8/21", Social Worker Regalbuto inexplicably modified Day-Harris's urgent IPE appointment, which had been scheduled for August 5th and was already two weeks late at that point.

45.     Upon information and belief, on August 20th, Day-Harris was not seen by anyone from medical or mental health.

**THE SUICIDE**

46.     On August 21st, Day-Harris was alone in Cell 154 on A-Block, with no prisoner in either cell next to him.

47.     According to post-incident records, Officer Harris and Officer Mendes were assigned to A-Block on the 3-11 pm shift, under Sergeant Bishop's supervision.  Officer Mendes later reported that he did not talk to Day-Harris that day; Officer Harris reported that Day-Harris said "hello" to him during his 7 pm hour tour, though he was "pacing" and "very quiet"; and Sergeant Bishop reported that he never spoke to Day-Harris during his detainment.

48.     The A-Block log contains the following entry from Officer Harris at 7:07 pm, "TOURED UNIT: APPEARS IN ORDER TOUR MADE ALL I/M'S ARE ALIVE".

49.     Approximately an hour later, shortly after 8 pm, Officer Harris was reportedly touring the top tier and noticed Day-Harris hanging from a sheet tied to the ladder of his bunk bed.  He alerted Officer Mendes, cut Day-Harris down, found a pulse, and started CPR.

50.     Sergeant Bishop, the supervisor on that Saturday night shift, arrived and took over chest compressions before giving way to the medical staff, who then gave way to emergency responders.

51.     Day-Harris was transported to Jefferson Torresdale Hospital, where he was treated intensively but could not be saved due to his anoxic brain injury.  After being declared brain dead, he was kept on life support so his organs could be harvested.  He was pronounced on August 25th due to complications of the hanging.

52.     On August 23rd, two days after Day-Harris hung himself but before he died, Centurion's Assistant Program Manager at PDP asked Social Worker Regalbuto whether Day-Harris "was on any of your call out lists for IPE backlog since his appt 8/5", to which she replied: "It does not appear so."

53.     Upon information and belief, within weeks of Day-Harris's suicide, the City replaced Centurion as the PDP behavioral health provider and either terminated or chose not renew Centurion's contract with the City.

### PREVALENCE OF INMATE SUICIDES AND ATTEMPTED SUICIDES

54.     Unfortunately, Day-Harris's suicide was far from an isolated incident.

55.     According to published statistics, in 2021, 18 prisoners died in City prisons (2 by suicide), more than double the national average and the highest since 2015, despite a 42% decline in the prison population.  In January of 2021, it was reported that suicide attempts roughly doubled compared to prior years.

56.     These alarming statistics represent a trend going back years.  For example, in 2012, a cluster of suicides occurred at multiple City prisons, with three suicides and one attempted suicide all happening within a week.  Between 2015 and 2019, it is believed that 14 prisoners died by suicide.  From February 2017 through January 2018, there were reportedly two suicides and 20 attempts.

57.     In the two year period from May 2019 through April 2021, the City reported 49 serious suicide attempts.  Centurion also tracked suicide data in City prisons, according to a spreadsheet detailing self-harm incidents in 2020 and 2021, on which Day-Harris appeared.

58.     A month before Day-Harris hung himself, another CFCF prisoner attempted suicide by hanging.  Three days earlier, a City prisoner committed suicide by jumping from a second tier at the Detention Center.

59.     The rampant prevalence of inmate suicides and attempted suicides has been a well known and publicized problem for a number of years.

60.     For example, in 2007, Prison Legal News reported that "*Philadelphia Settles Negligent Supervision Suit for $3.5 Million*", stemming from a former prisoner's permanent brain damage from a failed suicide attempt.

61.     In 2012, the Philadelphia Inquirer ("the Inquirer") published an article titled "*Rash of suicide alarms Philadelphia prison officials*", reporting inmate claims that "medical care is lacking, especially for inmates with mental-health issues."

62.     In a 2017 article titled "*Can Pennsylvania find a way out of thousands of mentally ill inmates languishing in county jails?*", the Inquirer quoted the PDP's chief of medical operations, Bruce Herdman, a s saying "This is the largest psychiatric hospital in the state of Pennsylvania."  The article reported that 40 percent of inmates were on psychotropic medications and 17 percent had SMI (such as schizophrenia).

63.     Woeful understaffing has been largely to blame.  In a 2017 article from WHYY titled "*Union chief questions staffing level at time of Philly inmate's suicide"*, the head of the City's correctional officers union said that CFCF was short-staffed when an inmate with a prior suicide attempt hung himself to death.

64.     In 2019, WHYY quoted Bruce Herdman as saying: "We were concerned about the effect of segregation on the mental health of people with mental illness…and of course there is the possibility of creating mental illness through segregation."  Centurion's medical director,

Deirdre Reynolds, was quoted as saying: "With the idea that the correctional system is becoming the new state hospital, it would be nice to be able to enhance the services for the seriously mentally ill in our population."

65.    In a 2020 article titled "*Pennsylvania Prison Suicides are at an All-time High. Families Blame 'Reprehensible' Mental Health Care*", the Inquirer referenced a number of recent lawsuits alleging that the deaths represent systemic failures by the likes of MHM.

66.    In a January 20, 2021 article regarding surging violence in the PDP, the Inquirer attributed problems to "short staffing and the mental health consequences of the strict lockdown".

67.    On March 30, 2021, the Inquirer published an article titled "*The Philly jail unit where a man was killed was left unsupervised for hours, records show*", quoting the executive director of the Pennsylvania Prison Society as saying: "This is not an aberration…they can't be safe facilities with the current staff-to-population ratio that they're having on a daily basis."  The president of the correctional officers' union was quoted as saying: "The prisons are crying for help and nobody is listening.  Staffing definitely has a role in a lot of things that are going on." City officials were quoted as saying: "Unfortunately, numbers of staff have developed a pattern of calling out, particularly on weekends and even without accrued leave."

68.    On June 2, 2021, in an article titled "*Public defender says Philly jails are 'cruel and callous', and violate clients' rights*", the Inquirer referenced "one of the worst crises in a half-century, one that has seen the city prison system embroiled in five sprawling lawsuits litigated over the course of years or decades", and reported on Friday protests outside the PDP facilities to address human rights violations.

69.     On July 30, 2021, in an article titled "*Two people died in a week in Philly jails.*

*Workers say a staffing crisis is partly to blame*", the Inquirer reported a "dysfunction and a

staffing crisis at the city jails".  Notably, the article reported:

- in June of 2021, the City agreed to pay $125,000 to avoid a contempt finding in a class action lawsuit concerning prison conditions (referenced below)
- Despite City Controller Rebecca Rhynhart's urging the City to hire 300 correctional officers, critical shortages continued, especially on weekends and on the 3-11 pm shift where "only 53% of scheduled security staff reported for work"
- On July 13th, the Prison Society wrote a memo to Commissioner Carney regarding "months-long delays in requests for medical care", which City Councilmember Helen Gym called a "dire emergency"

70.     On August 26, 2021, the day after Day-Harris died, the Inquirer published an

article titled "*'We need help': Video, reports depict violence and 'riots' at Philadelphia jails*".

Notably, the article, which referenced Day-Harris's suicide, reported:

- The day before, dozens of correctional officers protested "chronically unsafe and mismanaged jails" and called for Commissioner Carney's resignation
- During the protest, Councilmember Gym stated: "This is not just about a crisis. This is a five-alarm emergency."
- The Pennsylvania Prison Society executive director called for the national guard and complained: "We have been warning the city for months that the prison is dangerous, unconstitutional in its conditions, and past the boiling point…I don't know what it's going to take for the Kenney administration and the courts to address it.  A federal contempt order wasn't enough.  Five murders wasn't enough."
- Over 15% of jail staff left during 2020 and had not been replaced, leaving nearly 500 openings

71.     In the months following Day-Harris's suicide, the Inquirer published a series of

articles which continued to report on the uncorrected pattern and practice of constitutional

violations at the PDP, themes which the newspaper described as: "Rampant violence, delays in

medical care, ineffectual oversight, and attempts to cover it all up."  The articles were titled, *inter*

*alia*: "*4 Philly prisoners died in two weeks, capping a tumultuous and deadly year*"; "*Panic attacks and 20-hour workdays: Why Philly correctional officers are quitting in droves*"; "*29 people died in Philly jails in the pandemic.  City officials say they did a 'good job'*"; "*Five takeaways from our investigation of the crisis in Philadelphia jails*"; and "*The Philadelphia Prison Advisory Board is a farce*".

72.     These articles underscored two unsurprising developments:

- In October 2021, a Lieutenant and 23 year PDP employee wrote a whistleblower letter to Mayor Kenney, describing a "massive cover-up" of civil rights violations and advising that Centurion and others "refused to invest in the foundation of the Prison system" – the Inquirer found her allegations consistent with others that had been raised for months: "a lack of transparency by [Commissioner] Carney's team has concealed the depths of the jails' problems, and that those who speak up risk retaliation"

- In May 2022, a member of the Prison Advisory Board resigned over what she termed a "breaking point" – a Board unclear of its role and authority when dealing with an ineffectual Commissioner Carney

73.     Consistent with the Inquirer reporting, on February 17, 2022, a journalist with the Northwest Philadelphia Local Paper (a partner of WHYY), wrote:

These lockdowns, staff shortages, and overcrowded conditions are nothing new in the Philadelphia Prison System. These conditions have been a constant for decades, with federal authorities and the courts having to step in multiple times over the last 40 years. They are part of a long-standing pattern and practice that city officials have shown no interest in changing.

74.     Just last month, the Inquirer published an editorial titled "*Philadelphia's prisons are in crisis.  Mayor and Council need to act.*"  The editorial noted: "The prison system has been flailing and failing for years, but problems have festered under Commissioner Blanche Carney's leadership…If she is unable to adequately resolve the issues, she should be removed.  Without major change, the crisis in our prisons will only get worse."

## PATTERN AND PRACTICE OF CONSTITUTIONALLY DEPRIVING PRISONERS WITH SERIOUS MENTAL ILLNESS

75.     Long before the City and Centurion allowed Day-Harris to end his life in their custody, they were well aware of their failures to appropriately treat numerous prisoners like Day-Harris suffering from SMI.

76.     Going back years, as exemplified by the $3.5 million settlement reported in 2007, a plethora of civil rights lawsuits have been filed against the City, Centurion, and their representatives, including Commissioner Carney, Warden Farrell, and even Social Worker Fisher.

77.     More recent examples include the following notable lawsuits:

- *Abran v. City* (E.D. Pa. Case 18-1107) – 2016 hanging - lawsuit against the City, Commissioner Carney, and MHM

- *Jean v. City* (E.D. Pa. Case 22-433) – March 2021 inmate killing – lawsuit against the City, Commissioner Carney, and Warden Farrell

- *McDonald-Witherspoon v. City* (E.D. Pa. Case 17-1914) – 2016 drug overdose suicide - lawsuit against the City and MHM settled in 2020

- *Summers v. Delaney* (E.D. Pa. Case 17-191) – 2015 hanging suicide – lawsuit against the City, Commissioner Farrell, and MHM

- *McNamara v. City* (E.D. Pa. Case 20-4570) – 2018 drug death at CFCF – lawsuit against the City

- *Hargrove v.* (E.D. Pa. Case 21-4082) – March 2021 shooting of inmate just released from CFCF – lawsuit against the City, Commissioner Carney, and Warden Farrell

- *Lawhon v. City* (E.D. Pa. Case 22-4322) – April 2021 inmate killing – lawsuit against the City, Commissioner Carney, Centurion, and Social Worker Fisher

- *McCreesh v. City* (E.D. Pa. Case 20-3002) – 2017 hanging suicide – lawsuit against the City, Commissioner Carney, Warden Farrell, and MHM – MHM settled early 2023

- *Reed v. City* (E.D. Pa. Case 20-3640) – 2018 drug overdose suicide – lawsuit against the City, Commissioner Carney, and MHM settled 2022

78.     Another particularly noteworthy lawsuit, referenced above, involves a class action filed against the City and Commissioner Carney less than a year after Day-Harris committed suicide – *Remick v. City* (E.D. Pa. Case 20-1959).

79.     The lawsuit, filed in the name of ten PDP prisoners, was brought on behalf of all PDP prisoners and complained of numerous Fourteenth Amendment and other civil rights violations, including delayed medical care.

80.     During the lawsuit, the City twice agreed to pay $125,000 to avoid contempt findings.  Further, upon information and belief, two days before Day-Harris hung himself, the City submitted a status report which admitted to a "staffing crisis".

81.      Last year, a settlement agreement was reached, in which the City committed to, *inter alia*, have an independent monitor and address a significant medical care backlog due to staffing shortages.

82.     According to the Inquirer:

> That is just the latest in a half-century's worth of civil rights litigation over alleged violations at the jails. Repeatedly, Philadelphia officials have pledged to address what courts warned were unconstitutional conditions, from an intake area so crowded that prisoners were forced to sleep on the floor, to dangerously low staffing levels and woeful medical care.

83.     Despite numerous and repeated inmate suicides and suicide attempts over the years, the City and Centurion failed to create, implement and/or enforce the necessary policies and customs to protect civil rights of PDP prisoners, thereby establishing a custom of violating civil rights of those within their custody and control.

84.     Egregious and rampant failures on the part of the Officer Defendants and the Medical Defendants led to Day-Harris's tragic and preventable suicide.

85.     Plaintiff now seeks recovery from all Defendants for the catastrophic and fatal injuries, damages, and economic losses suffered by Day-Harris and his parents, as more fully described below.

## COUNT I - VIOLATION OF CIVIL RIGHTS (14TH AMENDMENT) PLAINTIFF v. DEFENDANTS

86.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

87.     At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Day-Harris's serious medical needs in violation of the Fourteenth Amendment's ban on cruel and unusual punishment.

88.     In particular, Defendants were deliberately and recklessly indifferent to Day-Harris's vulnerability to suicide, which they each knew or should have known about on or before August 21, 2021.

89.     For days, weeks, months, and even years, Defendants possessed actual knowledge of Day-Harris's serious mental illnesses, past suicidal ideations, and history of failed suicide attempts -- all of which amounted to telltale suicide risks.

90.     Prior to August 21, 2021, Day-Harris provided Defendants with verbal and behavioral cues upon which they should have acted in accordance with purported policies and training, including but not limited to the following: depressed state, withdrawal, refusal of visits, hallucinations, pacing and restlessness, and homicidal ideation.

91.     Despite such knowledge, Defendants ignored, if not exacerbated, Day-Harris's obvious suicidal propensities and failed to take necessary and available precautions which would have saved his life, such as housing him in the appropriate observation unit; providing the

appropriate diagnoses and treatments, including medications, counseling, and trained medical and mental health professionals including a Psychiatrist; obtaining and reviewing medical records from prior mental health treatments, including but not limited to those of Centurion; ensuring that he was observed at all times or at least at regular intervals; accurately documenting such observations; properly assessing his suicide risk; and denying him a means to commit suicide (i.e. placing him alone in a cell with an elevated bedframe and a bedsheet that he was able to tear and tie without correctional officer intervention).

92.    Defendants collectively failed to ensure the occurrence of Day-Harris's IPE (scheduled for two weeks pre-hanging) on any basis – urgent, emergent, or even routine.

93.    At a minimum, Defendants were duty bound to follow well established suicide prevention standards and guidelines, the collective purpose of which was to protect and enhance the mental health of inmates such as Day-Harris.

94.    The 2014 Standards for Health Services in Jails and 2015 Standards for Mental Health Services for Correctional Facilities, promulgated by the National Commission on Correctional Health Care, contain a **SUICIDE PREVENTION PROGRAM** (Section J-G-05 and Section MH-G-04, respectively).  The Program established, *inter alia*:

- *Nonacutely suicidal* inmates should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (e.g. 5, 10, 7 minutes), with unpredictable, documented supervision maintained;

- Patients are reassessed regularly to identify any change in condition indicating a need for a change in supervision level or required transfer or commitment.  The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions;

- Treatment strategies and services to address the underlying reasons (e.g. depression) for the inmate's suicidal ideation are to be considered, including treatment when the inmate is at heightened risk as well as follow-up interventions and monitoring to reduce the likelihood of relapse;

- Procedures for communication between mental health care, health care, and correctional personnel regarding inmate status are in place to provide clear and current information; and

- Housing.  Unless constant supervision is maintained, a suicidal inmate is not isolated but is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff.  All cells or rooms housing suicidal inmates are as suicide-resistant as possible (e.g., without protrusions of any kind that would enable hanging).

95.     In addition, the 2015 Standard contained Section MH-E-09 **CONTINUITY AND COORDINATION OF MENTAL HEALTH CARE DURING INCARCERATION**, mandating that all aspects of an inmate's mental health care are coordinated and monitored throughout the inmate's incarceration, in accordance with written policy and defined procedures. In relevant part, the Standard stated:

> When an inmate returns from a psychiatric hospitalization, urgent care, or emergency department visit that pertains to mental health, a mental health professional sees the patient, reviews the discharge orders, and issues follow-up orders as clinically indicated.
> …
> When delays or long wait times for specialty appointments occur, mental health staff should take intermediate care measures (e.g. placement in an observation cell) to monitor the inmate's mental status while waiting for these appointments.

96.     Defendants' failure to treat, monitor, and address Day-Harris's legitimate and serious medical needs transcended contemporary standards of decency, are shocking to the conscience of mankind, and violated his Fourteenth Amendment right to be free from cruel and unusual punishment.

97.     Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Day-Harris's life, safety, and well-being.

98.     As a direct and proximate result of Defendants' unlawful and unconstitutional

behavior, Day-Harris suffered serious bodily harm and death, and Day-Harris and his parents

suffered other catastrophic damages as set forth below.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly

and severally, for wrongful death and survival damages, compensatory and punitive damages in

an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest,

costs, attorney's fees and such other relief as the Court deems just and proper.

<u>**COUNT II - VIOLATION OF CIVIL RIGHTS (*MONELL* CLAIMS)**</u>
<u>**PLAINTIFF v. THE CITY, COMMISSIONER CARNEY, WARDEN FARRELL,**</u>
<u>**AND CENTURION**</u>

99.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

100.    The violations of Day-Harris's constitutional rights as set forth above were

directly and proximately caused by the deliberate indifference of the City, its highest-ranking

officials within the PDP (Commissioner Carney and Warden Farrell) and Centurion to the need

for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the

provision of specialized medical care to inmates such as Day-Harris, under their custody and

control.

101.    The violations of Day-Harris's constitutional rights as set forth above were

directly and proximately caused by the encouragement, tolerance, ratification of, and deliberate

indifference of the City and its private mental health provider to the policies and practices of

their agents and employees of refusing, delaying, interfering with, or negligently providing

timely and appropriate medical care and treatment to those in special need like Day-Harris.

102.    The violations of Day-Harris's constitutional rights as set forth above were

directly and proximately caused by the abject failure of the City and its private mental health

provider, with deliberate indifference, to develop, implement, update, and/or enforce policies and practices to ensure that inmates like Day-Harris received timely, necessary, and appropriate medical care for serious mental illness and critical life saving measures.

103.    On and well before August 21, 2021, the City and its private mental health provider knew or certainly should have known of the need to improve and correct failed hiring, training, supervision, investigation, monitoring, discipline, policies, and practices by virtue of, *inter alia*, a laundry list of other suicides and suicide attempts, published statistics and news articles regarding such suicides, and other similar lawsuits, alleged above.  In addition, the City and Centurion knew or should have known of the aforementioned glaring needs via mortality review reports, Extraordinary Occurrence Reports, Psychological Autopsies, and Suicide Prevention Group meetings involving, *inter alia*, Commissioner Carney, Warden Farrell, and the Behavioral Health Care Clinical Site Supervisor and Quality Improvement Director.

104.    By August of 2021, already a year and a half into the COVID pandemic, both the City and Centurion should have addressed known hiring vacancies, IPE backlogs, and SMI/BH inconsistencies, and ensured proper staffing, recognizing that delayed treatment and forced segregation of someone like Day-Harris would heighten his vulnerability and require constant vigilance and attention.

105.    The above referenced failures proximately caused Day-Harris's serious bodily injuries and death in that they directly and in natural and continuous sequence produced, contributed substantially, or enhanced such injuries and death.

106.    The aforementioned acts and/or omissions constitute willful and wanton misconduct in disregard of the rights, health, well-being, and safety of Day-Harris, to his detriment and that of his parents.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

<u>**COUNT III – MEDICAL NEGLIGENCE (STATE LAW)**</u>
<u>**PLAINTIFF v. MEDICAL DEFENDANTS**</u>

107.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

108.    At all relevant times, the Medical Defendants were, upon information and belief, licensed to practice medicine in the Commonwealth of Pennsylvania, and had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Day-Harris.

109.    The Medical Defendants violated their duty of care to Day-Harris and were careless, negligent, and reckless in the following respects:

a.    Failure to timely and accurately recognize, record, chart, diagnose, and treat Day-Harris's medical condition, including serious mental illness;

b.    Failure to timely and accurately diagnose Day-Harris's behavior as suicidal;

c.    Failure to perform a structured, informed, and appropriate suicide risk assessment and reassessment on a timely and accurate basis;

d.    Failure to assess Day-Harris as a high or at least moderate suicide risk, rather than a low one, based upon knowingly incomplete and/or inaccurate information provided by Day-Harris;

e.    Failure to implement and maintain an intense and appropriate treatment plan to minimize the risk of suicide;

f.    Failure to render proper and timely treatment and care to Day-Harris, including on an emergency/stat basis as required under the circumstances;

g.    Failure to obtain timely and appropriate consultation from specialists, including psychiatrists and psychologists;

h.      Failure to ensure that Day-Harris's IPE appointment, urgently scheduled for August 5th, was not postponed or modified, indefinitely;

i.      Failure to timely and appropriately prescribe and administer necessary medications;

j.      Failure to provide necessary, complete, and correct medical information to other medical professionals caring for Day-Harris about the care he required and/or was provided;

k.      Failure to timely appreciate the grave danger he was in and take seriously his multiple prior attempted suicides and suicide threats, which was reflected in a plethora of readily available internal and external documentation;

l.      Failure to timely appreciate Day-Harris's suicidal and homicidal ideations, anxiety, depression, panic, restlessness, inaudible speech, and other withdrawn and bizarre behavior;

m.      Failure to house Day-Harris in the appropriate housing unit and for the appropriate amount of time;

n.      Failure to ensure that Day-Harris was placed on Suicide Watch and/or Psychiatric Observation and properly observed at documented, regular intervals, per standards, guidelines, and orders, as he had been at different intervals during prior detainments at CFCF;

o.      Failure to ensure that Day-Harris was not provided with the means to hang himself – a bedsheet and elevated bedframe readily accessible while alone in a segregated cell;

p.      Failure to prevent Day-Harris from firmly attaching his bedsheet to the top of the bedframe, and creating a noose;

q.      Failure to ensure that Day-Harris possessed an anti-suicide smock and blanket at all relevant times;

r.      Failure to ensure that others, including supervisors, were timely and appropriately notified when Day-Harris had access to the means of suicide;

s.      Failure to timely obtain and review Day-Harris's prior mental health treatment records, including from Centurion, Pennsylvania Hospital, Albert Einstein Hospital, Fairmount Behavioral Health Hospital, and Norristown State Hospital;

t.      Failure to heed and appropriately respond to Day-Harris's cries for help and bouts of confusion, agitation, and helplessness, as can be seen and heard on numerous police videos (referenced above);

u.     Failure to observe, record, and evaluate self-harm evidenced by a cluster of horizontal scarring on Day-Harris's left forearm, documented in the autopsy report and depicted in autopsy photographs;

v.     Failure to appropriately consider Day-Harris's refusals to visit the medical clinic, undergo COVID testing, allow labs to be taken;

w.     Failure to appropriately consider the impact a positive HIV test result would or could have on a mentally vulnerable detainee;

x.     Failure to follow appropriate suicide related training and policies; and

y.     Entrusting Day-Harris's care to individual(s) who it should have known would perform his/her/their duties in a negligent and/or reckless manner.

110.   The Medical Defendants' violation of their duty of care, in reckless and wanton disregard for Day-Harris's safety and well-being, increased the risk of harm to Day-Harris and was a direct and proximate cause and substantial factor in bringing about Day-Harris's serious bodily injuries and death.

111.   To the extent that the individual Medical Defendants were acting as employees, agents and/or ostensible agents of Centurion, acting within the scope and course of their employment, agency, and/or ostensible agency, Centurion is vicariously liable to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

### FIRST CAUSE OF ACTION - WRONGFUL DEATH
### PLAINTIFF V. DEFENDANTS

112.   Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

113.   Plaintiff is the legal representative of the Estate of Quincy Day-Harris.

114.   Plaintiff brings this action by virtue of 42 Pa. C.S.A. §8301 and Pennsylvania Rule of Civil Procedure 2202 and claims all benefits of the Wrongful Death Act on behalf of

herself and all other persons entitled to recover under the law, including Day-Harris's mother, Juanita Day.

115.     By reason of Day-Harris's tragic death, his Administrator and/or his beneficiaries have suffered pecuniary losses and seek recovery of all medical, funeral, and administration expenses incurred as well as lost support, comfort, society, companionship, guidance, solace, protection and other services Day-Harris would have provided during his lifetime.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

<u>**SECOND CAUSE OF ACTION - SURVIVAL ACTION**</u>
<u>**PLAINTIFF V. DEFENDANTS**</u>

116.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

117.     Plaintiff brings this action on behalf of the Estate of Quincy Day-Harris by virtue of 42 Pa. C.S.A. §8302 and claims all benefits of the Survival Act on behalf of himself and all other persons entitled to recover under the law, including Day-Harris's mother, Juanita Day.

118.     Plaintiff claims on behalf of Day-Harris all damages suffered, including, but not limited to, significant conscious pain and suffering, catastrophic and fatal physical injuries and mental anguish, great fright, scarring, disfigurement, embarrassment, humiliation, loss of ability to enjoy life's pleasures, as well as the loss of future earning capacity from August 21, 2021 onwards.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in

an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

In accordance with the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all counts and issues raised herein.

**EISENBERG, ROTHWEILER,
WINKLER, EISENBERG & JECK, PC.**

By:   s/Todd A. Schoenhaus                          
NANCY J. WINKLER, ESQUIRE
TODD A. SCHOENHAUS, ESQUIRE
1634 Spruce Street
Philadelphia, PA 19103
(215) 546-6636
(215) 546-3641 fax
Attorneys for Plaintiff

Dated: August 21, 2023